## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CAP CARPET, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 13-CV-1140-JAR-KGG |
| | ) | |
| FUTURE FOAM, INC., HICKORY SPRINGS | ) | |
| MANUFACTURING COMPANY, CARPENTER | ) | |
| COMPANY, CARPENTER HOLDINGS, INC., | ) | |
| E.R. CARPENTER, L.P., FLEXIBLE FOAM | ) | |
| PRODUCTS, INC., FXI-FOAMEX | ) | **JURY TRIAL DEMANDED** |
| INNOVATIONS, INC., VALLE FOAM | ) | |
| INDUSTRIES (1995) INC., | ) | |
| VITAFOAM PRODUCTS CANADA LIMITED, | ) | |
| VITAFOAM, INC., MOHAWK INDUSTRIES, | ) | |
| INC., LEGGETT & PLATT, INC., | ) | |
| WOODBRIDGE FOAM CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff CAP Carpet, Inc. ("CAP Carpet") brings this action for damages under the Kansas Restraint of Trade Act.

## INTRODUCTION

The following allegations are made upon information and belief:

1.      This case arises out of a long-running conspiracy between and among the Defendant manufacturers of polyurethane foam to fix and control the price of flexible polyurethane foam and flexible polyurethane foam products (collectively "flexible polyurethane foam"). The conspiracy has been ongoing since at least January 1999.

2.      As used herein, flexible polyurethane foam refers to slabstock, carpet cushion, and molded polyurethane foam, which were the focus of the conspiracy. Flexible

polyurethane foam is widely used for cushioning and insulation in a variety of goods, including furniture, bedding, carpet cushion, and other products.

3.      During the time periods relevant to the allegations in this Complaint, Defendants and their co-conspirators agreed, arranged, contracted, combined, or conspired to fix, raise, control, maintain, and/or stabilize prices and allocate customers for flexible polyurethane foam in the United States and elsewhere, by the means and mechanisms described herein.  As set forth in detail below, executives and employees of Defendants and their co-conspirators engaged in specific and detailed communications between and among each other to fix and control prices and allocate customers.

4.      As a proximate result of the conspiracy, the prices that Defendants and their co-conspirators charged CAP Carpet and others for flexible polyurethane foam were artificially higher than they would have been in the absence of collusion in a competitive market.

5.      CAP Carpet brings this lawsuit pursuant to the Kansas Restraint of Trade Act, K.S.A. §§50-101 *et seq.*    In violation of §50-112, Defendants and their co-conspirators engaged in an unlawful arrangement, contract, agreement, trust, or combination to increase and/or control the price of flexible polyurethane foam.  *See also* K.S.A. §50-101 (declaring unlawful any agreement to, among other things, "pool, combine or unite any interest…in connection with the manufacture, sale or transportation of any such article or commodity").  CAP Carpet is entitled to recover the full consideration or sum paid for the flexible polyurethane foam that it purchased directly and/or indirectly from Defendants (and other sources whose pricing was a result of the unlawful acts of one or more of the Defendants).  *See* K.S.A. §50-115.  CAP Carpet further seeks to recover treble the damages incurred as a result of Defendants' conduct, as well as attorneys' fees and costs.  *See* K.S.A. §§50-108, 50-161.

## I.     THE PARTIES

### A.  <u>PLAINTIFF</u>

6.      Plaintiff CAP Carpet is a Kansas corporation with its principal place of business at 535 S. Emerson, Wichita, KS 67209.  During the time periods relevant to the allegations in this Complaint, CAP Carpet directly and/or indirectly purchased flexible polyurethane foam from certain Defendants and Defendants' co-conspirators.

### B.  <u>DEFENDANTS</u>

**<u>Future Foam</u>**

7.      Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its principal place of business at 1610 Avenue N., Council Bluffs, Iowa 51501.  Future Foam produces flexible polyurethane foam for, among other things, bedding, furniture, and carpet cushion.   CAP Carpet directly and/or indirectly purchased flexible polyurethane foam from Future Foam during the time periods relevant to the allegations in this Complaint.  Future Foam has a manufacturing facility in Newton, Kansas.

**<u>Leggett & Platt</u>**

8.      Defendant Leggett & Platt Inc. ("Leggett") is a Missouri corporation with its principal place of business in Carthage, Missouri.  Leggett manufactures, among other things, polyurethane foam and other components for bedding, furniture and carpet cushion.  During the time periods relevant to the allegations in this Complaint, CAP Carpet directly and/or indirectly purchased flexible polyurethane foam from Leggett.

**<u>Mohawk</u>**

9.      Defendant Mohawk Industries, Inc. ("Mohawk") is a Delaware corporation with its headquarters located in Calhoun, Georgia.  During the time periods relevant

to the allegations in this Complaint, CAP Carpet directly and/or indirectly purchased flexible polyurethane foam from Mohawk.

**Hickory Springs**

10. Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its principal place of business located at 235 2nd Avenue, NW, Hickory, North Carolina 28601. Hickory Springs produces flexible polyurethane foam for, among other things, bedding and furniture. Hickory Springs is one of the country's largest producers of foam and has more than 60 operating facilities in the United States and throughout the world. During the time periods relevant to the allegations in this Complaint, Hickory Springs directly and/or indirectly sold flexible polyurethane foam throughout the United States, including Kansas.

**Valle/Domfoam**

11. Defendant Valle Foam Industries (1995), Inc. ("Valle") is a corporation with its principal place of business in Brampton, Ontario. Valle is the parent of Domfoam International, Inc. During time periods relevant to the allegations in this Complaint, Valle directly and/or through Domfoam International, Inc. manufactured and/or directly sold polyurethane foam, including polyurethane foam for furniture, bedding, packaging, and carpet cushion. Valle communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale throughout the United States; and Valle otherwise engaged in the unlawful conduct described in this Complaint.

12. Defendant Domfoam International, Inc. ("Domfoam International") is a subsidiary of Valle with its principal place of business in Montreal, Quebec. During time

periods relevant to the allegations in this Complaint, Domfoam International directly and/or on behalf of Valle manufactured and/or directly sold polyurethane foam; Domfoam International communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States; and Domfoam International otherwise engaged in the unlawful conduct described in this Complaint.   According to Domfoam International, the manufacturer distributes polyurethane foam "coast to coast in Canada and in the USA."

**Carpenter**

13.     Defendant Carpenter Company ("Carpenter USA") is one of the largest manufacturers of polyurethane foam cushioning in the world.  Carpenter USA's headquarters is Richmond, Virginia, but it operates from approximately 30 locations throughout the country. Carpenter's products can be found at national retailers such as Bed Bath & Beyond and JCPenney, and its polyurethane flexible foam is distributed and sold in Kansas.

14.     During time periods relevant to the allegations in this Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or directly sold polyurethane foam, including polyurethane foam for carpet cushion, and engaged in the unlawful conduct described in this Complaint.

15.     Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("Carpenter ER") is a Virginia limited partnership with its principal place of business in Richmond, Virginia.  During time periods relevant to the allegations in this Complaint, Carpenter ER directly and/or on behalf of or through Carpenter USA or Carpenter Holdings manufactured and/or directly sold polyurethane foam, including polyurethane foam for carpet cushion, in the United States and engaged in the unlawful conduct described in this Complaint.

16.     Defendant Carpenter Holdings, Inc. ("Carpenter Holdings") is a Virginia corporation with its principal place of business in Richmond, Virginia. During time periods relevant to the allegations in this Complaint, Carpenter Holdings directly and/or on behalf of or through Carpenter USA or Carpenter ER manufactured and/or directly sold polyurethane foam, including polyurethane foam for carpet cushion, in the United States and engaged in the unlawful conduct described in this Complaint.

17.     Carpenter USA, Carpenter ER, Carpenter Holdings and/or Carpenter Canada were each members of the conspiracy alleged in this Complaint because of, among other things, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

18.     Carpenter USA, Carpenter ER and Carpenter Holdings are individually and collectively referred to in this Complaint as "Carpenter" or the "Carpenter Defendants."

**Vitafoam**

19.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located in Canada.  During the time periods relevant to the allegations in this Complaint, Vitafoam directly sold flexible polyurethane foam, either directly or through its affiliates, in the United States, including Kansas.

20.     Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding, carpet underlay, and automotive applications.  It also produces latex mattresses and toppers.

21.     Vitafoam, Inc. ("Vitafoam, Inc.") is a privately owned and operated company with its headquarters located in High Point, North Carolina.  During the time periods relevant to the allegations in this Complaint, Vitafoam Inc. directly sold flexible polyurethane

foam, either directly or through its affiliates, throughout the United States, including Kansas. Collectively, Vitafoam Canada and Vitafoam Inc. are referred to as "Vitafoam."

22.     In February 2010, Defendant Vitafoam Inc. approached the Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have cooperated with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market.

**Woodbridge**

23.     Defendant Woodbridge Foam Corporation ("Woodbridge") is a Canadian corporation.  Until 2011, Woodbridge had a registered agent and office in Kansas.  During the time periods relevant to the allegations in this Complaint, Woodbridge directly and/or indirectly sold flexible polyurethane foam throughout the United States, including Kansas.

**Flexible Foam**

24.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located in Spencerville, Ohio with operations throughout the country.  It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  Flexible Foam manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and automotive industries.  During the time periods relevant to the allegations in this Complaint, Flexible Foam directly and/or indirectly sold flexible polyurethane foam throughout the United States, including Kansas.

**Foamex**

25.     Defendant FXI – Foamex Innovations, Inc. f/k/a Foamex International Inc. ("Foamex"), is a privately owned and operated company with its headquarters located in Media, Pennsylvania.  Foamex provides foam for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its foam is used in automotive cushioning, shipping packages, beds and furniture, as well as personal electronics.  Foamex also provides components for filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives. During the time periods relevant to the allegations in this Complaint, Foamex directly and/or indirectly sold flexible polyurethane foam throughout the United States, including Kansas.

### C.  AGENTS AND CO-CONSPIRATORS

26.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' business or affairs.

27.     Various persons and/or firms not named as Defendants, including but not limited to Scottdel, Inc. ("Scottdel"), Crest Foam Industries, Inc. ("Crest Foam"), and Ohio Decorative Products, Inc. ("Ohio Decorative"), may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance of the conspiracy.

28.     Each Defendant acted as the principal, agent, co-conspirator, or joint venturer of or for the other Defendants and/or co-conspirators with respect to the acts, violations, and common course of conduct alleged by CAP Carpet.

29.     CAP Carpet reserves the right to amend this pleading to add co-conspirators as named Defendants based upon further investigation and discovery.

30.     To the extent any Defendant or co-conspirator engaged in conduct in Canada or Europe in connection with, or as part or in furtherance of, the unlawful conduct alleged in this Complaint, it did so with the intention that such conduct would have, and did have, a substantial and reasonably foreseeable direct, proximate and adverse effect on, and was inextricably linked with, the price of flexible polyurethane foam sold directly and/or indirectly to CAP Carpet and others in the United States, and that domestic effect – individually or in concert with other domestic effects alleged in this Complaint – gives rise to CAP Carpet's antitrust claims.

## II.     JURISDICTION AND VENUE

31.     CAP Carpet brings this action to recover full consideration, treble damages, costs of suit, reasonable attorneys' fees, and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. §§50-101 *et seq*.

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as this action is between citizens of different states, with citizens of a foreign state as additional parties, and has an amount in controversy in excess of $75,000.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c), and (d) because: a substantial part of the events giving rise to these claims occurred in this District, including the sales to CAP Carpet of flexible polyurethane foam at illegally fixed prices; each Defendant is subject to personal jurisdiction in this District; Defendants transact business in this District and/or they transact business directly and/or through the activities of domestic subsidiaries or affiliates; and certain Defendants are legal aliens and may be sued in this District.

34.     Defendants are subject to personal jurisdiction of this Court because:

(a) they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b) certain Defendants are registered with the Kansas Secretary of State to do business in the State of Kansas;

(c) they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling flexible polyurethane foam throughout the United States, including in this District;

(d) they are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling flexible polyurethane foam to CAP Carpet and others in this District at illegally fixed prices;

(e) they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308[1], because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and continues to transact) business in this state; committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas

---

[1] *See also Merriman v. Compton Corp.*, 146 P.3d 162 (Kan. 2006).

while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas; and

(f) they and one or more of their co-conspirators contracted to supply services or goods, including flexible polyurethane foam, or have agents who contracted to supply materials or goods, including flexible polyurethane foam, in this District; money flowed from CAP Carpet in Kansas to pay Defendants and their co-conspirators for flexible polyurethane foam; Defendants and one or more of their co-conspirators transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy; Defendants and their coconspirators committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants and their coconspirators engaged in unlawful conduct described below outside of the District causing injury to CAP Carpet in the District.

### III.    FACTUAL ALLEGATIONS

**A.  Flexible Polyurethane Foam and the Flexible Polyurethane Foam Market**

39.    There are several uses for flexible polyurethane foam.  The uses can generally be grouped into three main product segments: (1) block foam, also known as commodity or slabstock foam, which is poured then cut for use in such products as furniture cushions; (2) carpet underlay, made primarily from scrap flexible foam; and (3) engineered, or molded foam, which is used, among other things, for automobile products.

40.    Flexible polyurethane foam can be used in a variety of products, including upholstered furniture, mattresses, automobiles, and carpet cushioning.

41.     Flexible polyurethane foam is typified by open cells that make the end product soft, light, resilient, and breathable.  There are two basic procedures used to manufacture flexible polyurethane foam for cushioning.  In one procedure, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides of the conveyor allow the foam to rise into a "bun" or slab.  The continuous slab is then cut, stored, and allowed to cure for up to 24 hours.  The cured foam is subsequently fabricated into useful shapes.  This manufacturing procedure is called the slabstock production process and is used to produce most of the flexible polyurethane foam for bedding and furniture.

42.     The second procedure is called foam molding.  In this process, the same or substantially same chemical mix is poured into specially shaped molds, allowing the foam reaction to take place.  This process is used primarily for automotive cushioning, although some furniture utilizes molded cushions.

43.     In 2010, domestic revenue for the polyurethane foam industry was projected at $12 billion.  Typically, flexible polyurethane foam averages between 70-85% of the total output of polyurethane foam in the United States.

44.     There are various factors that made the market for flexible polyurethane foam highly susceptible to anticompetitive practices and unlawful collusion, which allowed Defendants to implement their anticompetitive conspiracy, including:

**i) Limited competition**

45.     Because of the manufacturing and product characteristics of flexible polyurethane foam, importation into the United States is neither practical nor economical.  Consequently, the vast majority of flexible polyurethane foam sold in the United States comes

from North America or a company with a United States-based subsidary.  Defendants and their co-conspirators collectively represent the majority of flexible polyurethane foam manufacturers.

46.     The flexible polyurethane foam market is contracting rather than adding new entrants.  Major manufacturers in the industry have actively acquired smaller companies and competitors over the course of the last ten years.

## ii) Inelastic demand due to lack of substitutes

47.     "Elasticity" describes the sensitivity of supply and demand to changes in one or the other.  Demand is "inelastic" if an increase in the price of a product results in little or no decline in the quantity of the product sold.  In other words, when a product is inelastic, customers do not have alternative options for cheaper products of similar quality, and therefore they continue to purchase the product despite a price increase.

48.     For a cartel to profit from raising prices among competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits because customers would purchase substitute products or decline to purchase the product altogether.

49.     Demand for flexible polyurethane foam is relatively inelastic without an acceptable alternative.  There is no acceptable substitute for flexible polyurethane foam in terms of economics, comfort potential, ease of use, and durability.

## iii) Standardized commodity product with a high degree of
## interchangeability

50.     A "commodity product" is one that is readily interchangeable and for which competition is primarily driven by price rather than other market pressures.  The mass production and interchangeability of commodity products results in pressure for competitors to

enter into conspiracies to fix and maintain prices and serves as a mechanism to successfully adopt and implement such conspiracies.

51.     Flexible polyurethane foam is classified as a commodity chemical product. Flexible polyurethane foam is a commodity used in hundreds of consumer products and is interchangeable across manufacturers.   The last major technological breakthrough in the production of flexible polyurethane foam occurred in the mid-20th century.

52.     Each Defendant and co-conspirator has the capability to produce the same or similar flexible polyurethane foam products.  Customers of flexible polyurethane foam make purchase decisions based principally on price.  This commodization and interchangeability of flexible polyurethane foam facilitated the Defendants' conspiracy by making coordination on price much simpler than if they were dealing with distinct products with varying features.

### iv) Opportunities to conspire

53.     Defendants and their co-conspirators are members of trade associations, including the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("ISPA"), Alliance on Flexible Polyurethane Foam, Carpet Cushion Council, and Surfaces, a trade group which includes polyurethane carpet underlay producers.  Approximately 70% of U.S. polyurethane foam manufacturers are members of PFA.

54.     Defendants seized upon these opportunities to meet in person to allocate customers and coordinate price increases.

### B.  Trade and Commerce

55.     From at least as early as January 1999, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce, and commerce within Kansas, is substantial.

14

56.     Defendants and their co-conspirators sold and shipped substantial quantities of flexible polyurethane foam to customers located in States, including Kansas, other than the States in which the Defendants produced the flexible polyurethane foam.

57.     Defendants and their co-conspirators have traveled between States and have exchanged communications through interstate wire communications and via U.S. mail.

58.     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

59.     The effect of Defendants' anticompetitive conduct on interstate and Kansas commerce gives rise to CAP Carpet's claims.

## C.  The Conspiracy to Fix Prices for Flexible Polyurethane Foam

60.     Beginning at least as early as January 1999, Defendants and their co-conspirators entered into a continuing conspiracy not to compete in the sale of flexible polyurethane foam sold to CAP Carpet and others.

61.     Compelling evidence of the conspiracy and the plausibility of CAP Carpet's claims first surfaced in July 2010 when law enforcement authorities from the United States Department of Justice ("DOJ"), the Canadian Competition Bureau ("CCB"), and the European Commission ("EC") executed coordinated raids on Defendants and their co-conspirators as part of Government investigations into alleged cartel activities among flexible polyurethane foam manufacturers and distributors.  Upon information and belief, the DOJ, CCB, and EC opened those investigations when Vitafoam Products Canada Limited and Vitafoam Inc. (collectively "Vitafoam") secretly came forward in February 2010 and confessed to its participation in the conspiracy.

### i)   Co-conspirator Vitafoam admits to the conspiracy

15

62.     Vitafoam manufactures flexible polyurethane foam for use in furniture, bedding, and automotive applications.  Between approximately January 1999 and July 2010, Vitafoam and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

63.     In February 2010, Vitafoam approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the flexible polyurethane foam industry and to seek acceptance into the DOJ's Corporate Leniency Program.  Since that time, Vitafoam and its employees have cooperated with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market.

64.     Vitafoam has received a conditional leniency letter from the DOJ, which means that Vitafoam admitted to its participation in a conspiracy to violate the U.S. antitrust laws.  A presentation from November 19, 2008 available on the DOJ's website explains that "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing…before it will receive a conditional leniency letter."

65.     In seeking conditional leniency with the DOJ and in connection with a Canadian government investigation of antitrust violations by manufacturers of flexible polyurethane foam, several current and former Vitafoam employees agreed to be interviewed regarding the flexible polyurethane foam price fixing conspiracy.  These interviews revealed the mechanisms, participants, duration, and impact of the conspiracy alleged herein.   These employees described a cartel among Defendants and their co-conspirators who are responsible for the production of a majority of flexible polyurethane foam.

ii)  **Vitafoam employees explain how Defendants conspired to fix prices and allocate customers**

66.     Vitafoam employees explained how flexible polyurethane foam manufacturers, including Future Foam, Leggett, and Mohawk established a practice where they would communicate and reach agreements on the percentage and timing of price increases and market allocation in the sale and supply of flexible polyurethane foam.   Price increase discussions occurred approximately two to three times per year and often coincided with the bi-annual meetings held by the PFA.

67.     Defendants and their co-conspirators used the pretext of increases in raw material costs to explain the conspiratorial price increases.  Defendants and their co-conspirators utilize chemicals, including polyols and toluene diisocyanate in the manufacturing of flexible polyurethane foam.  When Defendants' raw material suppliers announced price increases for the chemical ingredients of foam, Defendants and their co-conspirators contacted each other because this provided an opportunity to raise prices.  Defendants and their co-conspirators viewed the coordinated price fixing as necessary because if all conspirators did not increase their foam prices by the same percentage amount and at approximately the same time, the attempted price increase would fail.

68.     Beginning at least as early as January 1999, there was an understanding among the Defendants and their co-conspirators to collectively support supracompetitive prices. This understanding and agreement was reached through discussions among the competitors regarding the percentage of price increases, the dates of increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates.  Price increase announcement letters were then mailed to customers, reflecting the prices determined by their

conspirators.  Defendants and their co-conspirators policed these increases to ensure they were implemented by their co-conspirators, and they did not permit price reductions without consent of the overall group.

### iii) Former Vitafoam executives explain the conspiracy

69.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein.

70.     The former President of Vitafoam together with Defendants and their co-conspirators engaged in frequent and regular unlawful communications where they discussed and agreed to specific price increases and the timing of announcements regarding the effective date of those increases.

71.     As part of the conspiracy to support price increases, the former President of Vitafoam instructed his sales people to send copies of their draft price increase letters to the other co-conspirators, including the Defendants, and obtain their draft price increase letters. Defendants and their co-conspirators used these drafts to confirm their anticompetitive agreements and further implement the conspiracy.  The Defendants and co-conspirators with whom the former President of Vitafoam spoke also discussed how much each competitor wanted to raise prices, when the price increases should go into effect, and when the price increase letters should be issued.   These measures were used to set supracompetitive prices and ensure compliance with the conspiracy.

72.     Vitafoam's discussions about coordinating the price increases among Defendants and their co-conspirators were conducted primarily by means of telephone, electronic mail, and in-person meetings.  In-person discussions frequently took place at the PFA meetings.

73.     The former President of Vitafoam, along with his subordinates, discussed the conspiracy with Bruce Schneider of Future Foam and Don Coleman of Hickory Springs, among other employees and executives of Defendants' and co-conspirators' companies.

74.     In addition to these unlawful agreements to fix prices, the former Vitafoam executives, Defendants, and their co-conspirators agreed to avoid each other's customers and refrain from taking business or market shares from one another.

**iv) Recent or current Vitafoam executives**

75.     Vitafoam's Vice President of Sales is a former Woodbridge employee who had the authority to determine prices while working at Woodbridge in Ontario, Canada from 1986 until 2009.  In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales.  In his position at Vitafoam, he also had the authority to determine prices. This Vitafoam Vice President admitted to his role in the long-running conspiracy to fix prices and allocate customers while working for Woodbridge and Vitafoam.

76.     This Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam by reaching understandings and agreements on price increases with Defendants and their co-conspirators.  These agreements concerned the amount and effective date of the price increases.  The objective of the price increase coordination was for the conspirators to pass on cost increases to customers, as well as to maintain their respective market share.

77.     This Vice President of Vitafoam personally engaged in this conspiratorial conduct to fix prices and maintain market share with Future Foam, Leggett, and Mohawk, among other co-conspirators.

78.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States."  The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors."  Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with Todd Councilman, the Marketing and Sales Manager of Hickory Springs, and Buster Mann, the Vice President of the Eastern Division of Hickory Springs, among other co-conspirators.

79.     The sworn affidavit from Pierre-Yves Guay also states that this information is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by several entities including Future Foam, Leggett, and Mohawk. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

80.     The Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam while the Vice President was still employed by Woodbridge, to discuss price increases specifically for foam applications in the automotive industry.  Bill Lucas also acted for Crest, which was controlled by Vitafoam, in these communications.

81.     The President of Vitafoam was previously the Director of Corporate engineering at Woodbridge from 1985 until January 2008, where he had authority to determine prices.  Beginning in August 2008, as the President of Vitafoam, he also had authority to determine prices.

82.     During times relevant to this Complaint, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors, including Don Simpson, Buster Mann, and Lee Lunsford of Hickory Springs and Bruce Schneider and Robert Heller of Future Foam.  David Gurley, an employee at Vitafoam, also sent an email to the current President of Vitafoam in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs.

83.     Specifically, each of the price increases for flexible polyurethane foam going back to at least 1999 were the result of conspiratorial discussions among Defendants and their co-conspirators on pricing.

### v)  Implementation and enforcement of the conspiracy

84.     Defendants and their co-conspirators took substantial efforts to police the conspiracy.  Participants, including the former Vice President of Vitafoam, followed up after discussions with Defendants and co-conspirators to determine if the agreed price increases and effective dates were implemented.  If one of the Defendants or co-conspirators did not agree to raise prices at the same amount or during the same time period as the others, the other co-conspirators would apply significant pressure on the hold out conspirator.

85.     Defendants and their co-conspirators routinely exchanged and reviewed each other's price increase letters in order to confirm that their conspiratorial agreements were being implemented.  If a conspirator failed to exchange or confirm price increase letters, the other conspirators would threaten action to engage in competitive price wars against the non-cooperating conspirator.

### a)  Telephone calls and messages between co-conspirators

86.     Telephone conversations and telephone messages which government law enforcement secretly recorded with Vitafoam's cooperation from approximately May 2010 through June 2010 provide a revealing insight into the cartel's operation.

87.     On April 9, 2010, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam.   Schneider worked at Future Foam headquarters and called to inform Vitafoam that Future Foam, FXI-Foamex Innovations, Inc., and Flexible Foam intended to increase the price of foam by 20% in the next weeks.

88.     On another call, Schneider again discussed price increases by the conspirators with the President of Vitafoam.   Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st.  There is a letter out from Carpenter for 31st of May.  This is a letter out from Flexible for June 1st.  Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam."   The Vitafoam President asked: "Are you hearing anything from the other guys?   Or is it just kinda market stuff?"   Schneider responded: "Oh, from the other, the other people the foamers?  Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect.  Ya know, it would have been great to get 20% but I don't think so."   The conversation concluded with a request for information from Schneider.   "If you hear anything from your friends in Europe.  What's going on over there, I sure would like to know that as well."

89.     On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the current President of Vitafoam.   In this message, Schneider stated, "Hi [President], this is Bruce Schneider…If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

90.     On May 20, 2010, John Howard, President of Domfoam International, Inc. ("Domfoam"), a co-conspirator with Defendants, called the current Vitafoam Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer, who was attempting to acquire Domfoam customers.  Howard stated during the call:

> Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices. If he wants a battle, I'll give him a battle…These guys have been in at accounts they've never sold at…if he wants a battle, he's got one. We will start going after his accounts and it won't be pretty. We'll both end up hurting…I'm pissed off and our sales guys are pissed off and they're saying 'John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us. So, I'll let the dogs loose or I don't let the dogs loose. Want to mill it over and give me a shout back?"

The Vice President of Vitafoam responded:

> "It's sort of a bad time for me right now."

Howard then stated:

> "I don't expect an answer right now but, I'm leaving tomorrow night for a week. I would like to at least give the guys some indication that, 'Guys, give me another week. I think the dust is going to settle.' Or, 'Guys just do what you have to do. Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do. We have to respond.' So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

91.     On May 25, 2010, the Vice President of Vitafoam called Howard back. Howard stated during the call:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall,

that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit. But let him make his decision and if it's to continue going after them then tell him there'll be some consequences. That's it. I'm not gonna, no threats but I can't not do anything. The sales guys are getting kind of… 'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.' You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.'…Keep an eye on this guy, it's ah, he needs coaching, there you go."

92. On May 25, 2010, Howard left a voicemail message for the Vice President of Vitafoam stating:

"Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing, vis-à-vis going after each other's accounts. I'd be quite happy just to let it settle right here and not do anything more. But if [the President of Vitafoam] got some real pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off. So, give it some thought and maybe over the next day or two, just give me a shout and let me know. I understand you can't override [President of Vitafoam], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys.' That's not a winning strategy for us either. So, give me a call in the next day or two would you? And let me know what course of action Widmer's going to take here."

93. On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's President stating:

"Hey, it's Tim…Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

94. On June 3, 2010, Dean Brayiannis of Valle Foam Industries (1995), a co-conspirator of Defendants, called Steve Prescott of Vitafoam:

Brayiannis:    "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see."

Prescott:    "I didn't see, I had the old boy had faxed me one from a couple of days ago...Yah, okay, no problem. Yah, I guess, like that's, you know, it's game on again, isn't it."

Brayiannis:    "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett."

Prescott:    "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah."

Brayiannis:    "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do."

Prescott:    "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes."

Brayiannis:    "Yah, yah. Alright. Well our letter is out so hopefully, I'm assuming you've probably put something out by now."

Prescott:    "It's as good as done."

Brayiannis:    "Okay. Well we're already out, so we've already put our letter out."

95.    On June 9, 2010, Brayiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase:

Brayiannis:    "Still haven't seen or heard your increase letter yet."

Prescott:    "Well, have a look around."

Brayiannis:    "I have. Haven't found anything yet...I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?"

Prescott:    "People will lie to you, Dean."

| | |
|---|---|
| Brayiannis: | "Are you around the same time frame as us? July 5th or what?" |
| Prescott: | "Ah, yah, close." |
| Brayiannis: | "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?" |
| Prescott: | "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and…I guess one of the other U.S. guys. You know, everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?" |
| Brayiannis: | "Well at the end of the day over the last two increases we have chatted about it so just wanna make sure you got your letter out." |
| Prescott: | "Yah. Okay pal." |

96. On May 25, 2010, Vitafoam received a call from Michel Legendre of Carpenter, a co-conspirator of Defendants, who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010.  Six days later, on May 31, 2010, Legendre again called Vitafoam and told them that Carpenter would be raising prices by 11%.  The following day, Carpenter provided Vitafoam with a copy of the letter it sent to its customers, which included the dates and amounts of the price increases.

97. After Vitafoam raised its own prices, Legendre contacted Vitafoam on June 15, 2010.  He spoke with the Vice President of Vitafoam and asked whether Vitafoam was "ready for round 2?"  Legendre told the Vice President that Carpenter was preparing to send a letter the following day with a 12% price increase, effective July 19, 2010.  He also confirmed that manufacturers in "the States were similarly raising prices."

98.     Once Legendre and the Vitafoam Vice President finished discussing the details of the second price increase, they turned to a discussion of whether they should be speaking at all:

Legendre:      "Hey let me ask you something. That new boss of yours, you've got a guy there apparently I heard doesn't want us to communicate. Is that correct?"

Vitafoam:      "Ahhh..yah, that's that's true. That's ahh very true actually."

Legendre:      "Mine…[As you know] mine are the same right."

Vitafoam:      "Oh I understand."

Legendre:      "But I heard that jeez, the same thing I guess this guy you've got, I forget his name now, said the same thing he doesn't want nobody to talk and I'm like holy [expletive] ok here we go."

Vitafoam:      "Yah. Well, you know, that's, that's, that's, that's policy so…"

Legendre:      "Yah."

Vitafoam:      "That's…it's corporate stuff right."

…

Legendre:      "Ok. You know, I'm actually waiting for a third one [price increase]. I think it is going to be a repeat of, what is it, last year or the year before, I don't know."

Vitafoam:      "It was about three years ago. We didn't go up enough last year. The prices have been, the prices have been pretty low for a bit."

Legendre:      "Yah, you know what they've actually been too low really."

Vitafoam:      "Sorry?"

Legendre:      "They've actually been too low."

99.     On May 27, 2010, Lee Lunsford of Hickory Springs called the Vitafoam President and inquired whether Vitafoam was raising prices.  When the Vitafoam President

expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

100.    On June 3, 2010, Lunsford of Hickory Springs called Vitafoam and spoke with the current Vitafoam Vice President.  The Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month.  Lunsford inquired how much and was told it would be approximately 12%.  Lunsford agreed that this was acceptable to Hickory Springs.

### b)  Emails between co-conspirators

101.    Defendants and their co-conspirators also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam.

102.    In June 2000, the Vitafoam Vice President, who was an employee at Woodbridge at the time, sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of FXI-Foamex Innovations, Inc., and the salesperson responded: "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

103.    During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective January 1, 2005.

104.    On November 2, 2004, the Vitafoam Vice President sent an email to his superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases. They will announce for Jan. 1. They would go +20%."

105.    On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas."  The email stated: "They are going to market probably next week.  Looking for a Jan. 1 effective date.  Were [sic] going at

18%.  I said we would most likely be closer to 15%."  He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

106.    On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas: "Spoke with Lucas again last week.  We are trying to meet[] in Chattanooga."  He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls.  Said that they were successful at the mills, in Furniture – they were still one [price increase] behind."  The email continued: "I let him know we were going March 15th in Detroit [automotive sector].  He said they would probably wait until May 1.  Would have liked a more coordinated push."

107.    On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated: "In separate conversation, I talked to Lucas.  They are out with 11% on blocks nothing on Auto."  He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today."  After calling Mann, the employee wrote "I called Buster yesterday.  We spoke about the bedding stuff.  It is at numbers we are not used to."

108.    On May 22, 2008, Nikki Walborn of Scottdel sent an email with a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees including Louie Carson and Jeff Carter.  (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas).  On May 29, 2008, Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley forwarded the email and price increase letter to his superior at Vitafoam, the current President.

109.    On July 7, 2008, Jeff Carter, while still at Scottdel, forwarded an email with a draft price increase letter to David Gurley of Vitafoam, stating, "David, here is a copy of

our next increase letter. Jeff."   Gurley forwarded the draft price increase letter email to the company President who forwarded it to his subordinates, including Steve Prescott.

110.    On July 9, 2008, Steve Prescott forwarded the email to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough!  Check with your Carpenter contact to see when they plan on pulling the trigger."

111.    On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other than the EOR orders from the show. He said they went up the full 12% in Vancouver and they have gotten some for the business back. He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up. I just talked to Randy from Schneider and he said from the pricing his sales people have found that Mohawk has not gone up. Carmine has been after him for copies of their pricing but he can't get his hands on it. He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now."

Prescott asked in an email to Miller:

"Will Ben share info?"

Miller shortly thereafter responded to Prescott via email stating:

"Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08"

112.    On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to Vitafoam employees.  David Gurley received this email and forwarded those price increase letters to Jeff Carter of Future Foam in Texas.  Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating: "Louie and David, You probably have seen all these.  It's crazy out there again, personally I don't think this is enough of an increase."

113.    Louie Carson responded to Carter thanking him for the information. Carter forwarded his string of emails with Louie Carson to Gurley at Vitafoam who forwarded

the emails to his superiors with the message: "Please keep this confidential and read from the bottom up.  It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley.  Louie Carson is one of the owners of Scottdel."

114.    Vitafoam files also contained letters announcing a May 2009 increase from Flexible Foam (dated April 7, 2009), Mohawk Industries Inc. (dated April 10, 2009), Carpenter (dated April 13, 2009), Vita Canada dated (April 14, 2009), Leggett & Platt Inc. (dated April 15, 2009), and Future Foam (dated April 16, 2009).

115.    Following the May 2009 price increase there was a price increase in June 2009.  The Vitafoam files contained price increase letters from Mohawk Industries Inc., Flexible Foam, Carpenter, and Future Foam all dated May 18, 2009, and price increase letters from Leggett & Platt Inc. and Vita Canada dated May 19, 2009.

**vi) Defendants and their co-conspirators kept the conspiracy secret**

116.    The Vitafoam employees, the Defendants, and their co-conspirators took numerous steps to avoid detection of the conspiracy described in this complaint.

117.    At times, full names would not be used and instead participants would only use first names, initials, or code names.

118.    Defendants and their co-conspirators attended trade association meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  During times relevant to this Complaint, the conspirators regularly met through such organizations as the PFA.

119.    Defendants and their co-conspirators claimed the trade association meetings were nothing more than "meet-and-greet" sessions with their competitors.  They disguised their attendance at these events as information gathering, and used them as an

opportunity to fix prices and divvy up their customers.  They controlled the market, and attended these meetings to further ensure and perpetuate their control.

120.    Defendants and their co-conspirators also visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but actually used these opportunities to discuss coordinated price increases.

121.    The employees and executives at Defendants' and co-conspirators' companies avoided detection by, among other things, communicating through fax machines at local stores in order to hide the identification of the sender on the fax transmittal.

122.    The allegations in this Complaint detail the unlawful conduct of the Defendants and their co-conspirators and provide examples and insights into how the conspiracy operated and the scope of their cartel.  However, as alleged herein, Defendants fraudulently concealed their conspiracy from CAP Carpet.  Thus, discovery is needed in order to reveal the full scope and effect of the flexible polyurethane foam conspiracy.

## IV.    TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

123.    The statute of limitations as to Defendants' continuing antitrust violations was tolled because of the allegations above and below, among other reasons.

124.    CAP Carpet did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to disclosure in 2010 of the raids by government agencies of certain Defendants' and co-conspirators' facilities.

125.    Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.   Defendants and their co-conspirators concealed the conspiracy by meeting secretly, agreeing among themselves not to discuss the scheme publicly,

by holding secret meetings separate from formal trade association meetings they were publicly attending, and by disguising meetings and communications as technical and operational meetings.  As a result, CAP Carpet was unaware of the unlawful conduct alleged herein and did not know it was paying artificially high prices for flexible polyurethane foam.

126.    Neither Defendants nor their co-conspirators told CAP Carpet that they were fixing prices and allocating customers or engaging in other illegal collusive activity.

127.    Since at least as early as January 1999, Defendants and their co-conspirators committed continuing violations of the antitrust laws resulting in monetary injury to CAP Carpet.  Each of these violations constituted injurious acts.

128.    CAP Carpet did not know, and did not have reason to believe, more than three years before filing this Complaint that Defendants and/or their co-conspirators had entered into the conspiracy alleged in this Complaint.

129.    CAP Carpet's claims have been brought within the applicable limitations period.

## COUNT I
## VIOLATION OF KANSAS RESTRAINT OF TRADE ACT

130.    CAP Carpet incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs.

131.    From at least as early as 1999, continuing to the present, with precise dates to be ascertained in discovery and proven at trial, Defendants and other unnamed co-conspirators actively engaged in an unlawful arrangement, contract, agreement, trust, or combination designed to control and manipulate the price of flexible polyurethane foam sold to CAP Carpet and allocate customers, in violation of the Kansas Restraint of Trade Act, K.S.A. §50-101 and §50-112.

132.     Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act.  Each Defendant is fully liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

133.     Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to an agreement, arrangement and/or combination to, and maintenance and policing of, a plan to: fix and increase the price of flexible polyurethane foam; allocate the volume of sales and/or market share of flexible polyurethane foam; and control or reduce the output of and/or capacity to produce flexible polyurethane foam.  The purpose and/or effect of all of these actions was to restrain competition and artificially increase the price of flexible polyurethane foam.

134.     Defendants and their co-conspirators entered into and refined their illegal agreement, arrangement and/or combination through, among other things, the overt acts alleged above, including without limitation, participating in conversations and meetings to discuss the prices of flexible polyurethane foam to be sold, the allocation of flexible polyurethane foam accounts and/or the production of polyurethane foam; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging information on the sale of flexible polyurethane foam.

135.     Defendants affirmatively concealed from CAP Carpet and the general public the existence of their illegal agreements and arrangements through misrepresentations and omissions regarding this conspiracy.

136.     During and throughout the period of the agreement, arrangement and/or combination alleged above, CAP Carpet directly and/or indirectly purchased flexible polyurethane foam from the Defendants and/or Defendants' co-conspirators.  As a direct and proximate result of Defendants' illegal conduct, CAP Carpet directly and/or indirectly purchased flexible polyurethane foam at prices higher than they would have paid and on terms that are less favorable than would have been available in a competitive market.

137.     The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combinations and conspiracy was to control and artificially inflate the prices that CAP Carpet paid for flexible polyurethane foam.  Defendants' actions further restrained and controlled the full and free competition in the market for flexible polyurethane foam.

138.     Defendants' actions deprived CAP Carpet of the right to make budgeting, accounting, resource allocations and other financial and business decisions in a full and free competitive market for flexible polyurethane foam.

139.     As a result of CAP Carpet's direct and/or indirect purchases from Defendants and/or Defendants' co-conspirators, CAP Carpet suffered loss, injury and damage.

140.     Pursuant to K.S.A. §50-115, CAP Carpet seeks the full consideration they paid for flexible polyurethane foam sold to them by Defendants.  Pursuant to K.S.A. §50-108 and §50-161, CAP Carpet further seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

141.     There exists a significant threat of injury to CAP Carpet because Defendants' anticompetitive actions continue through today and/or are likely to reoccur.

142.    Pursuant to K.S.A. §50-161, CAP Carpet therefore seeks to enjoin Defendants from directly or indirectly continuing the conspiracy and/or the arrangement, combination, contract, or agreement to fix or control the price of flexible polyurethane foam and allocate customers.

## PRAYER FOR RELIEF

WHEREFORE, CAP Carpet prays for the following relief:

   a.  That the Court declare, adjudge, and decree that Defendants have committed the violations of Kansas law alleged herein;

   b.  That the Court award damages sustained by CAP Carpet in an amount to be proven at trial (full consideration), to be trebled according to law, plus interest, including pre-judgment and post-judgment interest, attorneys' fees and costs of suit, and such other and further relief as this Court may deem just and proper; and

   c.  That Defendants, their directors, officers, employees, agents, successors and members be enjoined from continuing in any arrangement, contract, agreement, combination and conspiracy to fix the price and/or limit the supply of flexible polyurethane foam and allocate customer markets, as detailed herein.

## REQUEST FOR A JURY TRIAL

CAP Carpet requests a jury trial as to all issues triable by a jury.

Respectfully Submitted,


By /s/ William D. Beil
        William D. Beil (D. Kan #18072)
        Brandon J.B. Boulware (D. Kan. #77976)
        ROUSE HENDRICKS GERMAN MAY PC
        1201 Walnut Street, Floor 20
        Kansas City, MO 64106
        Tele:　(816) 471-7700
        Fax:　(816) 471-2221
        Email: brandonb@rhgm.com
        Email: billb@rhgm.com

        James A. Walker　Ks. # 9037
        TRIPLETT, WOOLF & GARRETSON, LLC
        2959 North Rock Road, Suite 300
        Wichita, KS 67226
        Tele: (316)-630-8100
        Fax: (316)-630-8101
        Email: jawalker@twgfirm.com